IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2007

## CHRISTOPHER LOVIN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Claiborne County**
**No. 12,557     E. Shayne Sexton, Judge**

---

**No. E2006-01883-CCA-R3-PC - Filed July 5, 2007**

---

The petitioner, Christopher Lovin, was convicted of felony murder in the perpetration of aggravated child abuse and sentenced to life imprisonment. His conviction and sentence were upheld on direct appeal. Subsequently, he filed a petition for post-conviction relief, alleging that trial counsel was ineffective. After an evidentiary hearing, the post-conviction court dismissed the petition, and the petitioner timely appealed. Following our review, we affirm the dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Christopher Lovin.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William Paul Phillips, District Attorney General; and John W. Galloway, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In affirming the petitioner's conviction and sentence, this court set out the facts on which the conviction was based:

> At 1:12 A.M. on October 16, 2000, Cindy Gerralls and Rita Hurst, emergency medical technicians with the Claiborne County Ambulance Service, were dispatched to a Tazewell residence occupied by the [petitioner], Christopher Lovin, and his fiancé, Bonnie Raske. Ms. Raske, the mother of the victim, four-month-old Caylis Lovin, was outside directing the emergency unit to the proper location. Within four

minutes of the dispatch, Ms. Gerralls and Ms. Hurst arrived, finding the [petitioner], the father of the victim, inside the residence kneeling over his son. The [petitioner] had his left arm under a pillow and his right hand on the victim's abdomen. As Ms. Gerralls entered the room, the [petitioner] remarked, "I can't do anything more, I've been doing this for 30 or 45 minutes." Because the victim was born three months prematurely and had been cared for in the neonatal intensive care unit at the University of Tennessee Medical Center, he was connected to an apnea monitor at the time the emergency personnel arrived. Ms. Gerralls determined that the victim had no pulse, was "very, very cold and blue and was not breathing." There was no sound of alarm from the monitor during the period the emergency technicians were at the residence. Ms. Gerralls and Ms. Hurst transported the victim by ambulance to the Claiborne County Hospital emergency room, arriving precisely 15 minutes after the original dispatch. The medical staff was able to generate a heart rate but was unable to establish spontaneous respiration. After approximately one hour at the emergency room, the victim was transported to East Tennessee Children's Hospital in Knoxville.

Dr. Joseph Child, a pediatric intensivist, and one of his associates, Dr. Jeff Queen, treated the victim upon his arrival at Children's Hospital. Dr. Child determined that the victim had an extreme buildup of acid in the bloodstream which was the result of either a prolonged period of oxygen deprivation or very low blood pressure. With the assistance of other specialists, Dr. Child was able to determine that there was blood around the surface of the brain and between the hemispheres. The brain was swollen and a CAT Scan indicated that there was no blood flow. Dr. Child described the victim as "cold" and "gray." The victim's kidneys were failing and the retinas of each eye were covered with blood. Treatment was unsuccessful and death resulted from oxygen deprivation.

Bobby Morelock, a detective with the Claiborne County Sheriff's Department, questioned the [petitioner] while the victim was still alive. The [petitioner] made the following statement:

He was pale all day and coughing and turning colors. Mom got him out of his swing once to check on him. Everything was pretty normal seemed like. He was still pale, gurgling a little but he was breathing. I told Bonnie he was sick, he was just kind of lifeless throughout yesterday and last night. Caylis was asleep when Bonnie went to bed around 12:00. Bonnie fed Caylis before she went to bed. Caylis was crying around 12:30 A.M. and Bonnie asked what he was crying for. I was trying to hook up the heart monitor on him. I fed him before I tried to hook up the heart monitor but I never got the monitor hooked up. I got his breathing treatments ready but Bonnie already had everything ready in the treatment. Caylis was on the

-2-

couch and asleep so I got the breathing tube and put it close to Caylis's nose so I wouldn't wake him back up. When I got the treatment started and put the hose up to his nose, I held it there until it was done, about five minutes. I then put up . . . the breathing treatment. I then went to get his stuff to change his diaper and wipe him off. When I got his clothes off, I noticed he wasn't breathing. One of the reasons I took his clothes off was to hook his monitor back up. I didn't see any response to him. I picked him [up] and didn't feel nothing. I had my left hand on the back of his head, holding it up and just kind of shook it, saying, Caylis, Caylis, hoping he would shake out of it. I leaned down and gave him a puff of air and looked over at the monitor and it was showing nothing. I laid him back down on the couch and began CPR. I was trying for around five minutes. I was just trying to get him back. I kept screaming for Bonnie for a while. [I ] never moved him from the couch. I kept giving him puffs and pushing on his chest sometimes. I had to push a little harder because he never would do nothing. Bonnie got up and panicked and I was cussing at Bonnie because she just kept running through the house there and I said go – go call an ambulance, he's not breathing. She left to call and I just kept trying to get him breathing. Every time I quit, the monitor would quit. The ambulance people got there and didn't bring nothing inside with them. They just picked him up and carried him to the ambulance when they came in. I just unhooked the plugs from the monitor.

On the day following his initial statement, the [petitioner] was questioned by TBI Agent Steve Vinsant and Detective Morelock. By the time of this interview, the victim had died. Each of the officers recalled that the [petitioner] had acknowledged that he was alone with the victim at the time the victim stopped breathing. They also remembered that the [petitioner] never made mention of either shaking, striking, or dropping the victim. The [petitioner] was arrested for murder on October 19, three days after the initial hospitalization.

Agent Vinsant recalled that during questioning, the [petitioner] suggested that the emergency personnel may have injured the victim by jumping off the porch without properly supporting the head. Agent Vinsant recalled that the [petitioner] had speculated that the rib fractures may have been due to his efforts at CPR. According to the officer, the [petitioner] had stated that Ms. Raske had been in bed for over an hour before he called for medical assistance.

Dr. Child described infants generally as having large, heavy heads as compared to the rest of the body and having weak neck muscles, thereby making them particularly susceptible to a brain injury due to shaking. It was his opinion that

the death of the victim, which occurred within hours after he was transported to Children's Hospital, was due to Shaken Infant Syndrome, which involves a tearing of the blood vessels that support the brain. Dr. Child described the force required to cause the injuries to the victim as "severe" and "violent" in which "the head is just cracking like a whip at the neck." He also found internal bleeding into the abdomen as a contributing cause of death. The spleen was fractured, the liver was torn in three places, and the left kidney and adrenal gland were bruised and damaged, injuries which, in Dr. Child's opinion, "would have eventually led to this baby's death. . . ." It was his assessment that the injuries to the internal organs were the result of "blunt force," which had been "directly applied," a force different from that causing the damage to the head.

Dr. Sandra Elkins, the Director of Autopsy Services and Forensic Pathology at the University of Tennessee Medical Center, and who also serves as Medical Examiner for Knox County, performed the autopsy. She also identified two separate areas of critical injury, either of which would cause death: head trauma qualifying as Shaken Infant Syndrome and blunt force injuries to the chest and abdomen. Dr. Elkins' findings included subdural hematoma or blood clotting on the surface of the brain, retinal hemorrhaging, rib fractures due to a compressing force, pulmonary contusions to the lungs, and severe internal bleeding due to lacerations of the liver and the spleen.

Dr. Elkins described these injuries as very uncommon in infants and, in her opinion, far too severe to result from a fall to the floor or any attempt at cardiopulmonary resuscitation. Dr. Murray Kevin Marks, a forensic anthropologist, assisted in the autopsy. He described a variety of rib fractures ranging from "creases" to "complete breaks." It was his opinion that the fractures were due to significant external pressure on the right front of the chest.

Ronald Ford, a pediatrician at Children's Hospital, described the victim as comatose but still alive upon his admission to the intensive care unit. Due to the signs of brain trauma and the resulting brain swelling, it was Dr. Ford's opinion that the victim had died of "very violent shaking." It was Dr. Ford's further assessment that because of the extensive nature of the injury, the victim's brain was no longer able to send signals to the other organs to maintain their function.

Bonnie Raske, the 18-year-old mother of the victim, testified as a defense witness. She stated that the premature birth of the victim had caused breathing difficulties to such an extent that he required an apnea monitor. Ms. Raske confirmed that while the victim was born on June 11, he was not released from the hospital until September 2 and had been in her home for less than a month and a half at the time of his death. She described the victim as "always coughing, throwing up, he wouldn't hold his formula down." According to Ms. Raske, the victim was

re-hospitalized, treated for pneumonia, and released about one week prior to his death. Seven months pregnant with a second child by the time of trial, Ms. Raske described the [petitioner] as a loving father. She claimed that only hours prior to the episode that led to his death, the victim had stopped breathing and that she had revived him by shaking him and breathing into his mouth. Ms. Raske stated that the victim "constantly quit breathing" as indicated by his apnea monitor alarm. On the evening of the victim's last hospitalization, Ms. Raske and the [petitioner] had bought wine and had drinks. According to Ms. Raske, she became intoxicated, went to bed, and asked the [petitioner] to take care of the victim. She recalled being awakened when the [petitioner] began to scream that the victim was not breathing. At the [petitioner]'s direction, Ms. Raske called 911 while the [petitioner] administered CPR, using "both hands."

The [petitioner], testifying at trial in his own behalf, contended that he had planned a romantic evening with his fiancé and that after dinner, their lovemaking was interrupted when Ms. Raske became ill from too much wine. The [petitioner] claimed that he later gave the victim his medication and prepared him for bed. The [petitioner] stated that the apnea monitor alarm sounded as the victim stopped breathing. While acknowledging that he had shaken the victim's leg, the [petitioner] claimed that he had done so gently in an effort to revive the victim and then breathed air into his mouth. The [petitioner] testified that he began CPR by using an index finger on the chest and that when there was no response, he screamed for help from Ms. Raske, who was too dazed to assist. The [petitioner] stated that he then made contact with the victim's upper stomach in an effort to perform CPR and increased pressure to the area just above the navel. He described the pressure he applied with his hands as "more than I was realizing at the time." The [petitioner] stated that he believed the victim was either dying or dead by the time the ambulance arrived. He described himself as in shock and acknowledged that he had squeezed the victim "so hard . . . my arms were shaking" as he attempted resuscitation. The [petitioner] also admitted shaking the victim but was unable to say how hard. It was his contention that the medication had caused the victim to stop breathing.

State v. Christopher Lovin, No. E2002-01231-CCA-R3-CD, 2003 WL 22462532, at **1-3 (Tenn. Crim. App. Oct. 31, 2003).

In this matter, the petitioner filed a *pro se* petition for post-conviction relief, with accompanying memorandum of law. Counsel was subsequently appointed, and an amended petition was filed. Thereafter, private counsel was retained to represent the petitioner, and a second amended petition was filed. Additionally, the petitioner filed a "Pro Se Amendment to Petition and Amended Petitions for Post-Conviction Relief."

At the evidentiary hearing, the petitioner pursued some, but not all, of the claims he had made in his petition as to ineffective assistance of counsel. At the conclusion of the hearing, the post-conviction court made lengthy oral findings of facts and conclusions of law:

We are primarily here to review whether or not, within the post-conviction relief statute, the [petitioner] has been deprived of some constitutional right by virtue of either ineffective assistance of counsel or something to that effect, and that primarily is the claim made by the [petitioner] here. Many of the issues that were raised today do not fall within the purview of this particular hearing. However, the Court has allowed the petitioner to state with great specificity any complaint or claim that he might have.

At the beginning of the hearing, the Court outlined, or as best it could, outlined the primary issues raised by the petition and as we've gone through the hearing, I have listened to the testimony of [the petitioner] and also . . ., trial counsel, and the Court is of the opinion that in applying the Strickland standard that I am required to apply, that any . . . harm or prejudice that might have occurred through [trial counsel's] ineffectiveness did not . . . sufficiently prejudice the [petitioner] or the verdict in this case to the extent that relief should be granted. I'm not saying by inference that [trial counsel] was ineffective. I recall this case specifically. This was a very difficult case. The issues raised by the State in its case in chief called upon the defense to be very, very crafty for lack of a better word in raising some type of defense to these allegations. [The petitioner] was afforded a very admirable defense. [Trial counsel] and his staff, along with all the other public defender attorneys and investigators, investigated and fleshed this case out as best as it could be fleshed.

And the trial's – you know, concerning the tissue [box], I'm not exactly sure where that falls into this particular hearing other than maybe [trial counsel] might have objected to that, and the way I'm recalling that, it just happened, it just occurred, and maybe the State was – certain serendipitous opportunities arose and they took them. And whether or not an objection would have cured a problem, I don't know. It was a dramatic setting and it certainly had an impact on this jury.

. . . .

Finally, the question concerning . . . some other potential suspect having committed this offense, it would be logically inconsistent with the defense raised at proof, and I suppose that goes into the General's analogy with Monday morning quarterbacking. It's easy to go back now and say, well, maybe that would have worked, but using the scatter gun approach, as most trial attorneys understand . . . these issues are easy to say in the aftermath, but when you are in the middle of a trial – I'm not sure that [the petitioner] would understand the necessity that a theory -- a good theory is better than a whole lot of bad theories, and I think [trial counsel's]

-6-

approach in this particular case was to take the best defense, present it to the jury in a way . . . that was probably in the best light of his client and frankly was consistent with [the petitioner's] statements, so any other possible theory would have indirectly impeached the [petitioner's] pretrial statements or his trial testimony.

So, the main, five points raised by this particular petition, the Court finds that there has been no Strickland error and will deny any relief.

## ANALYSIS

On appeal, the petitioner has raised only the claims that trial counsel was ineffective for not objecting to the prosecutor's ridiculing in final argument the petitioner's last name; in not objecting to the State's asking the petitioner to demonstrate by using a tissue box how he tried to revive the victim; and for not raising the defense that the victim's mother may have caused the death.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-7-

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

As to the petitioner's complaint regarding the State's use of his last name during final argument, he explained that the prosecutor had said "it was ironic, ladies and gentlemen, that [the petitioner's] last name was Lovin and that [his] son didn't get no loving, he got beaten and shaken, and he got killed and, you know, things of that nature."

The trial transcript shows that, at the end of the State's final argument, the prosecutor made a statement similar to that recounted by the petitioner:

> It's ironic, ladies and gentlemen, . . . in the way all this happened that the [petitioner's] name was Lovin, because not having seen his wife for a while, what really killed this baby, what killed little Caylis is that Caylis interrupted the lovin'. But when the [petitioner] went into . . . the living room where he was at, where the little sick child was, who couldn't help it that he interrupted the lovin', that little child didn't get no lovin'. All he got was hitting and shaking and squeezing. He didn't get no lovin'.

No objection was made to this statement. On appeal, the petitioner has not suggested what objection would have been appropriate other than the statement was "prejudicial," and he has not provided legal authorities as to why even that was the case. Accordingly, this claim is waived. See Tenn. R. App. P. 39(a); Tenn. Ct. Crim. App. R. 10(b).

The petitioner claims, as well, that trial counsel was ineffective for not objecting to the State's asking the petitioner to use a "Kleenex" box to show how he tried to revive his son. However, the trial transcript shows that, after the demonstration had begun, defense counsel did object:

[THE STATE]: So is it fair to say now that you have demonstrated to us the very hardest that you did this pushing on the child? Is that fair to say, sir?

[THE PETITIONER]: No, sir.

[THE STATE]: Oh, it's not. Well, if you would, then, again, demonstrate to us – I want you to demonstrate the hardest that you pushed on this child while you were trying to resuscitate him. Please, sir. It's important.

[TRIAL COUNSEL]: Your Honor, I don't know if he can do that on a box of Kleenex or not, accurately demonstrate –

THE COURT: I'm going to allow the demonstration as best he can and if it appears that it cannot be adequately demonstrated, then I'll cut it off.

Mr. Lovin, do the best you can as far as demonstration to the jury. All right?

Thus, the record shows that trial counsel objected to this demonstration, but the objection was overruled by the trial court. This claim is without merit.

The petitioner explains in his appellate brief that trial counsel was ineffective for not arguing that the victim's mother was responsible for his death:

> Trial counsel, at trial, did not thoroughly emphasize the actions of the other person in the residence, Bonnie Raske, who had also been alone with the child on the night in question. Trial counsel, unable to refute the evidence of injuries presented by the state's multiple expert witnesses, was also unable to successfully offer an alternative explanation for the existence of the injuries. One such explanation would be the theory that the injuries may have been caused by an intoxicated Bonnie Raske when she was alone with the child outside of petitioner's presence.

At the evidentiary hearing, trial counsel explained that the petitioner had not wanted to pursue at trial the theory that the victim's mother was responsible for his death:

> Q. With regard to the argument or that Bonnie Raske, the [petitioner's] girlfriend, may have had something to do with this crime, did you discuss the possibility of developing that theory with [the petitioner]?
>
> A. It's my recollection that we did discuss that and that we talked to . . . him about that as being a possible way to go in this case, and my recollection is that he would have nothing to do with that, that he always maintained that she had nothing to do with this, that she was a good mother and . . . hadn't done anything to cause the death of this baby and that we were not to pursue that, and . . . we found no evidence that would support her being the one that caused the injuries or death.
>
> Q. In fact, his prior statements to law enforcement officers sort of limited that defense?
>
> A. Yeah.
>
> Q. Wouldn't that be a fair statement?
>
> A. Yes.
>
> Q. That if he was going to tell you something that would have implicated her, that would have been contrary to the statements he'd already given?
>
> A. Correct.

Q. And did he really testify to anything at trial that indicated that she possibly was involved in it?

A. My recollection, and I did try to review the transcript prior to this hearing, . . . that he specifically said that she didn't have anything to do with it.

Q. And I take it you talked – did you talk to her in preparation for the case?

A. Yes, either I did or Ms. Clemmons or both of us.

Q. During any of those interviews, [did] you become aware of any information from her that would have persuaded you that perhaps she, in fact, had something to do with killing the baby and inflicting these terrible injuries?

A. No, sir.

The opinion of this court on direct appeal sets out the various statements made by the petitioner and none suggest or would be consistent with the argument that the victim was killed by his mother. In fact, the petitioner specifically told TBI Agent Steve Vinsant and Detective Bobby Morelock that "he was alone with the victim at the time the victim stopped breathing." Christopher Lovin, 2003 WL 22462532, at *2. Further, according to Agent Vinsant, the petitioner "suggested that the emergency personnel may have injured the victim by jumping off the porch without properly supporting the head" and "that the rib fractures may have been due to his efforts at CPR." Id.

Thus, a trial claim that the victim's mother was responsible for the death would have been contrary to the petitioner's statements to law enforcement officers, as well as his speculation that the head injury may have been caused by emergency medical personnel.

We concur with the findings of the post-conviction court that the petitioner failed to prove either that trial counsel was ineffective or that he was harmed by the alleged mistakes by trial counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
ALAN E. GLENN, JUDGE